## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) ) ) |
| *Plaintiff,* | ) **Case No. _____** |
| v. | ) **COMPLAINT FOR** |
|  | ) **DECLARATORY AND** |
| MASSACHUSETTS WATER RESOURCES | ) **INJUNCTIVE RELIEF AND CIVIL** |
| AUTHORITY, | ) **PENALITIES** |
|  | ) |
| *Defendant.* | ) |
|  | ) |

## INTRODUCTION

1.     The Massachusetts Water Resources Authority ("MWRA") is responsible for monitoring and treating the polluted wastewater of over 5,500 hospitals, manufacturers, and other industrial users in Greater Boston before it is discharged into Massachusetts Bay.

2.     MWRA's responsibility, conferred by the United States Environmental Protection Agency ("EPA"), is essential to water quality protection under the National Pretreatment Program.

3.     Over 200 times, MWRA failed to issue the required enforcement responses to its industrial users that violated pollutant parameters like cyanide, lead, and mercury, and other permit conditions.

4.     MWRA's failures to enforce are even more extensive and pervasive than publicly-available information shows.

5.     MWRA's noncompliance with its EPA-approved Enforcement Response Plan and its federal permit violates the Clean Water Act, contributes to water quality degradation, and harms Conservation Law Foundation's ("CLF") members.

1

6.    CLF seeks declaratory judgment, injunctive relief, issuance of a civil penalty, and other relief with respect to MWRA's violations of the Clean Water Act, 33 U.S.C. §§ 1251, 1311(a), 1342, 40 CFR § 403, and its National Pollutant Discharge Elimination System ("NPDES") permit.

## JURISDICTION AND VENUE

7.    Plaintiff brings this civil suit under the citizen suit provision of Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

8.    This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1); 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States); and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

9.    On February 23, 2022, Plaintiff notified MWRA and its agents of its intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements of Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations located at 40 C.F.R. § 135.2. A true and accurate copy of Plaintiff's Notice Letter ("Notice Letter") is attached as Exhibit 1. The Notice Letter is incorporated by reference herein.

10.    Defendant received the Notice Letter. Return receipts attached as Exhibit 2.

11.    Plaintiff also sent copies of the Notice Letter to the Administrator of the EPA, the Regional Administrator of EPA Region 1, the Citizen Suit Coordinator, and the Massachusetts Department of Environmental Protection ("MassDEP").

12.    Each of the addressees identified in paragraph 11 received the Notice Letter. Ex. 2.

13.     More than sixty days have elapsed since Plaintiff mailed its Notice Letter, during which time neither EPA nor the Commonwealth of Massachusetts has commenced an action to redress the violations alleged in this Complaint. 33 U.S.C. § 1365(b)(1)(B).

14.     The Clean Water Act violations alleged in the Notice Letter are of a continuing nature, ongoing, or reasonably likely to re-occur. The Defendant remains in violation of the Clean Water Act.

15.     Venue is proper in the United States District Court for the District of Massachusetts pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## PARTIES

**PLAINTIFF**

16.     CLF is a nonprofit, member-supported, regional environmental advocacy organization dedicated to protecting New England's environment.

17.     CLF has a long history of working to protect the health of New England's water resources, including addressing sources of wastewater pollution.

18.     CLF has over 6,300 members in New England.

19.     CLF members use and enjoy the beaches and waters of Boston Harbor and Massachusetts Bay for recreational and aesthetic purposes, including but not limited to swimming, boating, fishing, and observing wildlife.

20.     CLF members use the waters of Boston Harbor and Massachusetts Bay for scientific and occupational purposes, including but not limited to studying marine ecology, metals, microbes, and marine mammals.

**DEFENDANT**

21.   MWRA is a Massachusetts public authority established by an enabling act passed in 1984. Mass. Gen. Laws Chapter 372, (1984).

22.   MWRA provides wholesale water and sewer services to 3.1 million customers and over 5,500 large industrial users throughout eastern and central Massachusetts. MWRA, "Comprehensive Annual Financial Report," available at https://www.mwra.com/finance/documents/CAFR/CAFR_20-21-FINAL.pdf.

23.   In fiscal year 2021, MWRA's customer service revenues were approximately $781.4 million, and MWRA's total operating expenses were approximately $291.4 million.[1] *Id.*

24.   MWRA's total assets as of June 30, 2021 were approximately $7.1 billion. *Id.*

25.   MWRA is the authority that oversees and coordinates the preliminary primary and secondary treatment to its wastewater flows at the Deer Island and Clinton Treatment Plants.

26.   MWRA is the "person," as defined by 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

27.   An "Industrial User" is "...a source of discharge of Industrial Waste to a Sewerage System." 360 CMR 10.004.

28.   MWRA's Deer Island Treatment Plant, located at 190 Tafts Ave., Winthrop, MA 02152, is a Publicly Owned Treatment Works ("POTW") as defined by the Clean Water Act and federal regulations. 33 U.S. Code § 1292(2)(A) (defining POTW); 40 CFR § 403.3(q) (same).

29.   EPA issued NPDES Permit No. MA0103284 to MWRA for the operation of the Deer Island Treatment Plant. NPDES Permit attached as Exhibit 3.

---

[1] The operating expenses exclude depreciation.

4

## STATUTORY AND REGULATORY BACKGROUND

**THE CLEAN WATER ACT**

30.    The objective of the Clean Water Act is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1972).

31.    The Clean Water Act prohibits the addition of any pollutant to navigable waters from any point source except as authorized by a NPDES permit applicable to that point source. 33 U.S.C. §§ 1311(a) and 1342.

32.    The Clean Water Act's implementing regulations define the "discharge of a pollutant" as "[a]ny addition of any 'pollutant' or combination of pollutants to 'waters of the United States' from any 'point source.'" 40 C.F.R. § 122.2; *see also* 33 U.S.C. § 1362(12).

33.    A "pollutant" is any "solid waste," "chemical wastes, biological materials," "wrecked or discarded equipment, rock, sand," or "industrial … waste" discharged into water. 33 U.S.C. § 1362(6).

34.    The Clean Water Act defines navigable waters as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "Waters of the United States" are further defined by EPA regulations. 40 C.F.R. § 120.2.

35.    Massachusetts Bay is a "Water of the United States" as defined by the Clean Water Act and EPA regulations. *See* 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2.

36.    "Point source" is defined broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit … from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

**THE NATIONAL PRETREATMENT PROGRAM**

37.   In implementing the Clean Water Act, EPA established the National Pretreatment Program to address indirect discharges from industries to POTWs.

38.   The National Pretreatment Program was established, in part, because of the known negative effects of wastewater to receiving waters—and to curb the potential harm to human and aquatic life, as well as to land. 40 CFR § 403.1.

39.   EPA states: "[t]he national pretreatment program is designed to … reduce conventional and toxic pollutant levels discharged by industries and other nondomestic wastewater sources into municipal sewer systems and into the environment." EPA, "Procedures Manual for Reviewing a POTW Pretreatment Program Submission," 1–4, available at https://www.epa.gov/npdes/national-pretreatment-program-approval-authority-documents.

40.   Regarding the National Pretreatment Program, EPA states: "Some pollutants are not amenable to biological wastewater treatment at POTWs and can pass through the treatment plant untreated. This pass through of pollutants affects the receiving water and might cause fish kills or other deleterious effects." EPA, "Introduction to the National Pretreatment Program," at iii, available at https://www.epa.gov/sites/default/files/2015-10/documents/pretreatment_program_intro_2011.pdf.

41.   Regarding the National Pretreatment Program, EPA states: "Even when a POTW has the capability to remove toxic pollutants from wastewater, the pollutants can end up in the POTW's sewage sludge, which might then be processed into a fertilizer or soil conditioner that is land-applied to food crops, parks, or golf courses or elsewhere." *Id.*

42.   "Pass Through" is defined as "a Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or

discharges from other sources, is a cause of a violation of any requirement of the POTW's

NPDES permit, including an increase in the magnitude or duration of a violation)." 40 CFR §

403.3(p).

43.    Regarding Pass Through, EPA states: "...toxic pollutants can pass through the treatment

plant into the receiving stream, posing serious threats to aquatic life, human recreation, and those

consuming fish and shellfish from the waters. Pass through can make waters unswimmable or

unfishable, in direct opposition to the goals of the CWA. It can also interfere with the biological

activity of the treatment plant, causing discharges of untreated or inadequately treated sewage."

EPA, "Introduction to the National Pretreatment Program" at 1-3.

44.    The National Pretreatment Program requires certain POTWs to develop pretreatment

programs for pollutants from Industrial Users. 40 CFR § 403.8(a).

45.    A pretreatment program is subject to EPA approval and incorporated into the POTW's

NPDES permit. 40 CFR § 403.8(b)-(c).

46.    POTWs regulate Industrial Users' wastewater discharges, including requirements to

pretreat or otherwise control pollutants in its wastewater. 40 CFR § 403.8(f)(1).

47.    The National Pretreatment Program requires POTWs to "develop and implement

procedures to ensure compliance with the requirements of a Pretreatment Program." 40 CFR §

403.8(f)(2).

48.    According to EPA, "[t]he POTW must be able to respond to challenges by industrial

users, to protect its investment in the treatment plant, to ensure the beneficial uses of its waters,

and to protect the health and welfare of its citizens." EPA, "Procedures Manual for Reviewing a

POTW Pretreatment Program Submission," 1–4, available at

https://www.epa.gov/npdes/national-pretreatment-program-approval-authority-documents.

49.   The National Pretreatment Program requires POTWs to develop and implement enforcement response plans to investigate and respond to instances of Industrial User noncompliance. 40 CFR § 403.8(f)(5).

50.   A POTW's enforcement response plan "shall contain detailed procedures indicating how a POTW *will* investigate and respond to instances of industrial user noncompliance." 40 C.F.R. § 403.8(f)(5) (emphasis added).

51.   To combat prohibited discharges, "each POTW... shall develop and enforce specific limits to implement the prohibitions listed in … this section. Each POTW with an approved pretreatment program shall continue to develop these limits as necessary and effectively enforce such limits." 40 C.F.R. § 403.5(c)(1).

52.   Massachusetts state regulations, 360 CMR 10.00, govern the discharge of sewage, drainage, substances, and wastes into any sewer under MWRA's control.

53.   Massachusetts state regulations, 360 CMR 2.11, establish the enforcement options available to the MWRA when Industrial Users are in violation of the sewer use regulations, 360 CMR 10.00.

## FACTUAL BACKGROUND

54.   MWRA's Deer Island Treatment Plant is located in Winthrop, Massachusetts, on a peninsula in Boston Harbor.

55.   Each day, MWRA discharges millions of gallons of effluent from the Deer Island Treatment Plant to Massachusetts Bay. Ex. 3 at 1.

56.   Massachusetts Bay is adjacent to Cape Cod Bay and the Gulf of Maine.

57.   Effluent from the Deer Island Treatment Plant is carried through a tunnel and released to Massachusetts Bay through an outfall.

58.   The effluent from MWRA's Deer Island Treatment Plant contains, among other things: arsenic, cyanide, mercury, lead, copper, and zinc.

59.   Ocean currents can carry the effluent from the Deer Island Plant's outfall in all directions.

60.   Ocean currents can carry the effluent from the Deer Island Plant's outfall into Boston Harbor and the inner coastal waters and beaches along the Massachusetts coast. Surface current maps attached as Exhibit 4.

61.   MWRA's discharges to Massachusetts Bay are governed by an EPA-issued NPDES Permit. Ex. 3 at 1.

62.   Sludge is made up of the heaviest components of wastewater which settle at the bottom of treatment tanks. MRWA, "Recycling Wastewater Sludge into Fertilizer" available at https://www.mwra.com/03sewer/html/sewssc.htm.

63.   MWRA processes the wastewater sludge at its facility into fertilizer pellets which it sells under the names New England Fertilizer and Bay State Fertilizer. *Id.*

64.   MWRA acknowledges that "[c]opper levels in MWRA's fertilizer pellets have sometimes exceeded the most-stringent state standards for reuse." MWRA, Toxic Reduction and Control, "Which pollutants create the most concern for TRAC?" available at https://www.mwra.com/03sewer/html/trac.htm#pretreatment.

65.   In 2019, "man-made chemicals known commonly as PFAS — or per- and polyfluoroalkyl substances — [were] detected in [MWRA's] fertilizer — chemicals that have been linked to low infant birth weights, increased cancer risk, and immune system changes, among other health effects…." Christopher Gavin, "'Forever chemicals' were found in MWRA fertilizer. Here's what to know," Boston.com, Dec. 3, 2019, available at

https://www.boston.com/news/local-news/2019/12/03/forever-chemicals-mwra-fertilizer-what-to-know/.

66.   "Bay State Fertilizer is purchased wholesale by golf courses and landscapers throughout New England and has been available locally through garden centers and nurseries since 1995." MRWA, "Recycling Wastewater Sludge into Fertilizer."

67.   "Many communities within the MWRA sewerage district use the fertilizer on their parks, athletic fields, and municipal landscaping." *Id.*

**MWRA'S PRETREATMENT PROGRAM**

68.   MWRA's NPDES permit includes an EPA-approved industrial pretreatment program. Ex. 3 at 22.

69.   MWRA's industrial pretreatment program includes an Enforcement Response Plan, which EPA approved in 1992. MWRA's Enforcement Response Plan attached as Exhibit 5.

70.   The Enforcement Response Plan defines how MWRA will investigate and respond to instances of Industrial User noncompliance. Ex. 5 at 1.

71.   The Enforcement Response Plan states that "[e]ach instance of noncompliance *will be* met with an enforcement response." Ex. 5 at 5 (emphasis added).

72.   The "cornerstone" of the Enforcement Response Plan is the Enforcement Response Guide ("Guide"). Ex. 5 at 1.

73.   The Guide "sets forth the criteria, procedure, responsibilities, and time frames for selecting and initiating an enforcement response for violations of MWRA Sewer Use Rules and Regulations." Ex. 5 at 1.

74.   Neither the Enforcement Response Plan nor its Guide authorizes the MWRA to decline to take an enforcement action in response to an Industrial User's noncompliance. Ex. 5.

75.    The required enforcement response "may be formal or informal as indicated in the Enforcement Response Guide." Ex. 5 at 5.

76.    MWRA Enforcement Section staff are responsible for "[r]esponding to instances of noncompliance in accordance with MWRA regulations and the Enforcement Response Guide." Ex. 5 at 2.

77.    Once alerted to a violation, MWRA Enforcement Section staff "determine what type of enforcement action is appropriate according to the Enforcement Response Guide." Ex. 5 at 4.

78.    "When determining the appropriate response," MWRA staff review "a variety of criteria," including but not limited to: the magnitude and duration of the violation, the effect of the violation on the receiving water and/or the POTW, and the Industrial User's compliance history and/or good faith. Ex. 5 at 6.

79.    The Guide's "options reflect the MWRA's authority to take enforcement action against Industrial Users that have violated or threaten to violate the MWRA Sewer Use Regulations."

80.    The Plan states: "Compliance Staff will take one or more of the enforcement options described above to respond to instances of noncompliance with the MWRA's Sewer Use Regulations." Ex. 5 at 8.

81.    The Plan's "enforcement approach is progressive, that is, violations are addressed at the lowest level possible. Where an industrial user's response to an enforcement action is unacceptable to the MWRA, the MWRA will escalate its enforcement responses until the industrial user has returned to compliance." Ex. 5 at 9.

82.    The Guide lists pretreatment program violations and escalating schedules of enforcement actions. Ex. 5 at 9-15.

83.    The Guide provides "a range of enforcement responses from which enforcement

11

personnel will select an appropriate enforcement response for a specific violation." Ex. 5 at 9.

84.   A Notice of Violation ("NOV") is an informal enforcement response and is appropriate "when responding to *relatively minor or infrequent* instances of noncompliance." Ex. 5 at 6 (emphasis added).

85.   The escalating schedule of formal enforcement responses include: Notice of Noncompliance ("NON"), Order or Compliance Schedule ("Order"), Cease and Desist Order ("C&DO"), Supplemental Order to Comply ("SOC"), Enforcement Order ("EO"), Penalty Assessment Notice ("PAN"), Notice of Proposed Permit Revocation ("NPPR"), and Revocation of Permit or Denial of Permit/Permit Renewal, Emergency Suspension of Service, Criminal Prosecution—each with an increasing level of severity as relates to a violation. Ex. 5 at 6-7.

86.   The Enforcement Response Plan states that "[t]he standard escalation path for continued or recurring violation is as follows: Notice of Violation à Notice of Noncompliance à Penalty Assessment Notice and Supplemental Order à Notice of Proposed Permit Revocation." Ex. 5 at 9.

87.   For exceedances of discharge limits, the Guide identifies the appropriate enforcement response depending on the "nature of the violation" by the Industrial User:

Table 1: Discharge Violations[2]

| Nature of Violation | Enforcement Response Option |
|---|---|
| Isolated, 1st or 2nd violation (non-consecutive or different parameters) | Notice of Violation within 10 working days of discovery |
| Repeated or frequent violations | Notice of Noncompliance/Order within 45 days of receipt of results of repeat sampling following Notice of Violation; Penalty Assessment Notice and Supplemental Order to Comply within 60 days of noncompliance |

---

[2] Ex. 5 at 10.

| | |
|---|---|
| | with Notice of Noncompliance/Order; Notice of Proposed Permit Revocation; civil referral |
| Significant Noncompliance | Notice of Noncompliance/Order within 60 days of significant noncompliance determination; Penalty Assessment Notice and Supplemental Order to Comply within 60 days of discovery of continuing violations after Notice of Noncompliance/Order or Ruling; Notice of Proposed Permit Revocation within 60 days of noncompliance with Supplemental Order to Comply |

88.   For Industrial Users' sampling and reporting violations, the Guide identifies the appropriate enforcement response(s) depending on the noncompliance and the nature of the violation:

Table 2: Sampling and Reporting Violations[3]

| Noncompliance | Nature of Violation | Enforcement Response Option |
|---|---|---|
| Sampling or reporting deficiencies | Isolated or infrequent (1st or 2nd violation) | Notice of Violation withing 10 working days of discovery |
| | Frequent (3rd violation in the last 2 years) or persistent | Notice of Noncompliance/Order within 45 days; Penalty Assessment Notice within 60 days of violation of Notice of Noncompliance/Order |
| Complete failure to sample or report | Significant Noncompliance | Notice of Violation withing 10 working days of discovery of failure to receive report; Notice of Noncompliance/Order within 45 days of noncompliance with Notice of Violation; Penalty Assessment Notice and Supplemental Order to Comply within 60 days of compliance due date with Notice of Noncompliance Order; Notice of Proposed Permit Revocation |

---

[3] Ex. 5 at 11.

13

89.   The Plan states that Penalty Assessment Notices "will be issued when a user violates a NON and/or Order, and may be issued for other violations that the MWRA deems serious…." Ex 5 at 11.

90.   Significant Noncompliance includes: "[a]ny discharge of a pollutant that has caused imminent endangerment to human health, welfare or to the environment or has resulted in the POTW's exercise of its emergency authority under paragraph (f)(1)(vi)(B) of this section to halt or prevent such a discharge." 40 CFR § 403.8(f)(2)(viii) (defining "significant noncompliance").

91.   In the Enforcement Response Plan and its Guide, a Notice of Noncompliance is the least severe enforcement option available for an instance of significant noncompliance. *See* Ex. 5 at 10.

92.   Neither the Enforcement Response Plan nor its Guide identifies a Notice of Violation as an enforcement option for significant noncompliance with a discharge limit. *See* Ex. 5 at 10.

93.   The Guide states that second step for an Industrial User in significant noncompliance with a discharge limit is to issue a "PAN and SOC within 60 days of discovery of continuing violations after NON/Order or Ruling." Ex. 5 at 10.

**HISTORY OF MWRA'S ENFORCEMENT AND RECORD-KEEPING**

94.   Since January 2017, MWRA has taken no enforcement action in response to at least 70 instances of noncompliance by Significant Industrial Users ("SIUs"),[4] including 15 instances of significant noncompliance by SIUs.

95.   On at least 123 occasions, SIUs were in significant noncompliance due to their discharge limits violations in fiscal years 2017–2021. MWRA, 2017–2021 Industrial Waste Reports, available at

---

[4] *See* MWRA, "SIU Definition," available at https://www.mwra.com/03sewer/html/siudef.pdf; 40 CFR § 403.3(v).

https://www.mwra.com/annual/tracindustrialwastereport/industrialwastereports.htm (hereinafter "IWRs").

96.   Of the 123 instances of significant noncompliance with discharge limits by SIUs from 2017–2021, MWRA issued only 40 Notices of Noncompliance. IWRs.

97.   On information and belief, MWRA has regularly failed to escalate its enforcement responses for repeated discharge violations of the same parameter and/or in a consecutive year as required by its Enforcement Response Plan.

98.   Publicly available information shows that since 2017, MWRA has failed to escalate its enforcement for repeated violations by SIUs in at least 46 instances.

99.   Trends in the enforcement data indicate that the actual number of failures to escalate enforcement is well above 46 instances:

    a.   In fiscal years 2017–2021, there were at least 123 instances of significant noncompliance with discharge limits by SIUs, each of which requires a minimum of a Notice of Noncompliance, yet MWRA issued only 40 Notices of Noncompliance—and only five responses more severe — to SIUs. IWRs.

    b.   In fiscal years 2017–2021, MWRA issued over 300 warnings in response to gas/oil separator violations, and there is no record that MWRA issued any response *other* than a warning letter for any gas/oil separator violations from 2017–2021, indicating either: not one Industrial User repeated a gas/separator violation in five years or MWRA did not escalate its responses for repeat violations.[5] IWRs.

---

[5] The Guide contains a schedule of enforcement for gas/separator violations that includes escalating responses for continued violations. Ex. 5 at 15-16.

c.   In fiscal year 2018, MWRA did not take any enforcement response more severe than a Notice of Noncompliance for any of its thousands of Industrial Users. 2018 IWR at 3, 6.

100.  MWRA issued penalties for only a small fraction of the instances of noncompliance by Industrial Users.

101.  Over five years, from 2017–2021, SIUs have been in significant noncompliance due to discharge violations on at least 123 occasions, but MWRA issued only one Penalty Assessment Notice to an SIU.

102.  Over five years, from 2017–2021, MWRA issued only 23 Penalty Assessment Notices to any of its Industrial Users, including both SIUs and non-significant Industrial Users.

103.  Over four years, from 2018–2021, MWRA issued only five penalty assessments to any of its Industrial Users, including both SIUs and non-significant Industrial Users.

104.  In fiscal year 2017, MWRA collected a total of $122,750 in penalties: $100,000 from one SIU; $15,000 from another SIU; and the remaining penalties were $1,000 or less.

105.  In fiscal year 2018, MWRA collected one penalty of $1,000.

106.  In fiscal year 2019, MWRA collected $14,000, of which $5,000 was paid by one SIU.

107.  In fiscal year 2020, MWRA collected $50,000 in penalties, of which $14,000 was paid by one SIU and the remainder was an Industrial User's outstanding penalty from a prior year.

108.  In fiscal year 2021, MWRA collected no penalties.

109.  MWRA must provide EPA with an annual report that "briefly describes the POTW's program activities … and must include, at a minimum," information on Industrial Users that are in significant noncompliance. 40 C.F.R. § 403.12(i).

110. Pursuant to 40 C.F.R. § 403.12(i), MWRA creates "Industrial Waste Reports," which is submitted to EPA and publicly available on MWRA's website. *E.g.*, 2018 IWR at 1.

111. In its Industrial Waste Reports, MWRA identifies which SIUs are in significant noncompliance, but it does not list what parameter or parameters the SIU violated, or when an SIU was in non-significant noncompliance.

112. In its Industrial Waste Reports, MWRA states when an enforcement action was sent to an SIU, but it does not identify which violation or violations the enforcement action addressed.

113. The only "informal" enforcement action that MWRA includes in the Industrial Waste Reports are Notices of Violation. IWRs.

114. If MWRA takes informal enforcement actions other than Notices of Violation, it does not report them to EPA or the public. *See* IWRs.

115. Failure to include information in the Industrial Waste Reports makes it impossible for EPA or the public to verify that MWRA has responded to each instance of Industrial Users' noncompliance because: (i) SIU non-significant noncompliance is not included; and (ii) there is no information indicating which enforcement action is tied to which instance of noncompliance.

116. Failure to include information in the Industrial Waste Reports makes it impossible for EPA or the public to verify that MWRA has complied with the Enforcement Response Plan in every instance because: (i) there is no information as to what parameter was violated; and (ii) there is no information regarding SIUs' non-significant noncompliance. Neither EPA nor the public have enough information in Industrial Waste Reports to determine whether particular instances of noncompliance were repeated and therefore required an escalated enforcement response.

117. Failure to include information in the Industrial Waste Reports makes it impossible for EPA or the public to verify that MWRA has complied with the Enforcement Response Plan in every instance because: (i) there is no information as to what parameter was violated; (ii) there is no information regarding SIUs' non-significant noncompliance; and (iii) there is no way to determine which previous enforcement actions were taken with respect to which noncompliance and thus required penalty assessments for continued noncompliance. Neither EPA nor the public have enough information in the Industrial Waste Reports to determine whether particular instances of noncompliance required penalties and whether MWRA issued the required penalty.

## **DEFENDANT'S VIOLATIONS OF THE CLEAN WATER ACT**

118. MWRA discharges wastewater to the Massachusetts Bay from the Deer Island Treatment Plant pursuant to its NPDES Permit, which contains "effluent limitations, monitoring requirements and other conditions." Ex. 3 at 1.

119. A violation of a NPDES Permit is a violation of the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342(k).

120. MWRA's NPDES Permit states:

d.   In Section 14(b): "The permittee shall develop and enforce specific effluent limits (local limits) for Industrial User(s), and all other users as appropriate, which together with appropriate changes in the POTW Treatment Plant's Facilities or operation, are necessary to ensure continued compliance with the POTW's NPDES permit, or sludge use or disposal practices." Ex. 3 at 22.

e.   In Section 15(a): "MWRA shall implement an industrial pretreatment program (IPP) as required by 40 CFR Part 403. The industrial pretreatment program shall

be operated in accordance with MWRA's approved pretreatment program plan and 40 CFR Part 403." Ex. 3 at 22.

    f. Section 15(a)(iii): MWRA shall "[o]btain appropriate remedies for noncompliance by any industrial user with any pretreatment standard and/or requirement; and maintain an adequate revenue structure for continued implementation of the Pretreatment Program." Ex. 3 at 23.

121. MWRA's EPA-approved Enforcement Response Plan requires MWRA to:

    g. take enforcement action when an Industrial User is in noncompliance, *supra* ¶¶ 68–93;

    h. take elevated enforcement action when an Industrial User is in significant noncompliance, *supra* ¶¶ 68–93;

    i. escalate enforcement action when an Industrial User repeats noncompliance, *supra* ¶¶ 68–93;

    j. issue penalties when an Industrial User meets certain criteria, *supra* ¶¶ 68–93.

122. Publicly-available information shows MWRA has failed to take an enforcement action following Industrial User noncompliance at least 70 times in the past five years. *Supra* ¶¶ 94–117.

123. On information and belief, further investigation will show that the enforcement violations identified by CLF are representative of MWRA's normal practices and operations and are evidence of a pattern and practice of failing to take enforcement actions following Industrial Users' noncompliance over the past five years.

124. Publicly-available information shows MWRA has failed to take the required level of enforcement action following significant noncompliance by an Industrial User at least 83 times in the past five years. *Supra* ¶¶ 94–117.

125. On information and belief, further investigation will show that the enforcement violations identified by CLF are representative of MWRA's normal practices and operations and are evidence of a pattern and practice of failing to take enforcement actions following Industrial Users' noncompliance over the past five years.

126. Publicly-available information shows MWRA has failed to escalate enforcement action following repeat noncompliance by an Industrial User at least 46 times in the past five years. *Supra* ¶¶ 94–117.

127. On information and belief, further investigation will show that the enforcement violations identified by CLF are representative of MWRA's normal practices and operations and are evidence of a pattern and practice of failing to escalate enforcement action following repeat noncompliance by Industrial Users over the past five years.

128. On information and belief, MWRA has failed to issue penalties to Industrial Users as required by the Enforcement Response Plan and further investigation will show that the trends indicating failures to issue penalties are representative of MWRA's normal practices and operations and are evidence of a pattern and practice of failing to issue required penalties over the past five years.

129. MWRA's failures to (1) take any enforcement action following Industrial Users' noncompliance, (2) take the required level of enforcement action following Industrial Users' significant noncompliance, (3) escalate enforcement following repeat noncompliance by

Industrial Users, and (4) issue required penalties, are failures to enforce the specific effluent limits for its Industrial Users. *See* Ex. 3, Sec. 14(b).

130. MWRA's failures to enforce the specific effluent limits for its Industrial Users violates Section 14(b) of its NPDES Permit and therefore the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342(k).

131. MWRA's failures to (1) take any enforcement action following Industrial Users' noncompliance, (2) take the required level of enforcement action following Industrial Users' significant noncompliance, (3) escalate enforcement following repeat noncompliance by Industrial Users, and (4) issue required penalties, are failures to operate its industrial pretreatment program in accordance with its approved pretreatment program plan and 40 CFR Part 403. *See* Ex. 3 Sec. 15(a).

132. MWRA's failures to operate its industrial pretreatment program in accordance with its approved pretreatment program plan and 40 CFR Part 403 violate Section 15(a) of MWRA's NPDES Permit, and therefore the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342(k).

133. MWRA's failures to (1) take any enforcement action following Industrial Users' noncompliance, (2) take the required level of enforcement action following Industrial Users' significant noncompliance, (3) escalate enforcement following repeat noncompliance by Industrial Users, and (4) issue required penalties, are failures to obtain appropriate remedies for its Industrial Users' noncompliance with pretreatment standards and/or requirements. *See* Ex. 3, Sec. 15(a)(iii).

134. MWRA's failures to obtain appropriate remedies for its Industrial Users' noncompliance with pretreatment standards and/or requirements violate Section 15(a)(iii) of MWRA's NPDES Permit, and therefore the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342(k).

## DEFENDANT'S VIOLATIONS HARM CLF'S MEMBERS

**HARM CAUSED BY DISCHARGED POLLUTANTS**

135. MWRA's Industrial Users regularly violate limits for pollutants like mercury, cyanide, lead, copper, nickel, zinc, cadmium, chromium, silver, and acidity that harm water quality and endanger wildlife and human health.

136. On information and belief, MWRA's Industrial Users violate arsenic limits.

137. MWRA's Deer Island Treatment Plant cannot treat and/or remove all of the pollutants in incoming wastewater.

138. When Industrial Users discharge wastewater that exceeds pollutant limits, the Deer Island Treatment Plant does not treat and/or remove all of the Industrial Users' pollution, and therefore additional pollution is discharged into Massachusetts Bay.

139. MWRA treats wastewater using the "the activated sludge process," which leaves a portion of the metals in the effluent MWRA discharges into Massachusetts Bay.

140. In 2020, after the activated sludge process, 88% of the arsenic, 66% of the nickel, 16% of the zinc, 14% of the silver, 13% of the chromium, 9% of the copper, 8% of the lead, 7% of the cadmium, and 3% of the mercury from the wastewater remained in the effluent that MWRA discharged to Massachusetts Bay. 2020 IWR at 11.

141. MWRA recognizes that mercury "can be highly toxic and is known to bioaccumulate (build up) in fish and (potentially) humans and marine mammals who consume these fish."[6]

142. The Center for Disease Control's Agency for Toxic Substances and Disease Registry ("ATSDR") states: "[t]he nervous system is very sensitive to all forms of mercury. … Exposure

---

[6] MWRA, "Which pollutants create the most concern for TRAC?" available at https://www.mwra.com/03sewer/html/trac.htm#reports.

to high levels of metallic, inorganic, or organic mercury can permanently damage the brain, kidneys, and developing fetus. … Short-term exposure to high levels of metallic mercury vapors may cause effects including lung damage, nausea, vomiting, diarrhea, increases in blood pressure or heart rate, skin rashes, and eye irritation."[7]

143.  Exposure to high levels of cyanide, even over a short time, "harms the brain and heart and can even cause coma and death."[8]

144.  High levels of cyanide in soil "becomes toxic to soil microorganisms" and as a result, "cyanide is able to pass[] through soil and into underground water."[9]

145.  The ATSDR states: "[l]ead can affect almost every organ and system in your body. The nervous system is the main target for lead poisoning in children and adults. … Exposure to high lead levels can severely damage the brain and kidneys and can cause death. In pregnant women, exposure to high levels of lead may cause a miscarriage. In men, it can cause damage to reproductive organs."[10]

146.  Children are more vulnerable to the harmful effects of lead than adults.  Exposure to even "lower levels" of lead "can decrease mental development, especially learning, intelligence, and behavior" in children.[11]

147.  Lead can stick to soil particles and can move into groundwater.[12]

148.  Lead exposure can occur from eating food or drinking water that contains lead and "spending time in areas where the soil is contaminated with lead."[13]

---

[7] ATSDR, "Mercury – ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts46.pdf.
[8] ATSDR, "Cyanide: Division of Toxicology and Environmental Medicine ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts8.pdf.
[9] *Id.*
[10] ATSDR, "Lead – ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts13.pdf
[11] *Id.*
[12] *Id.*

149. As MWRA states on its own website: "Copper levels in MWRA's fertilizer pellets have sometimes exceeded the most-stringent state standards for reuse."[14]

150. "Copper released into the environment usually attaches to particles made of organic matter, clay, soil, or sand. Copper does not break down in the environment. Copper compounds can break down and release free copper into the air, water, and foods." [15]

151. "High levels [of copper] can cause harmful effects such as irritation of the nose, mouth and eyes, vomiting, diarrhea, stomach cramps, nausea, and even death."[16]

152. Regarding cadmium, the ATSDR states: "[e]ating food or drinking water with very high levels severely irritates the stomach, leading to vomiting and diarrhea. Long-term exposure to lower levels of cadmium in air, food, or water leads to a buildup of cadmium in the kidneys and possible kidney disease."[17]

153. People can become sensitive to nickel and can have reactions, including rashes and asthma attacks, when they eat food or drink water containing nickel.[18]

154. Animal studies show that "eating or drinking large amounts of nickel has caused lung disease … and affected the stomach, blood, liver, kidneys, and immune system … as well as their reproduction and development." [19]

155. Zinc builds up in fish, and exposure to large amounts of zinc can cause "stomach cramps, anemia, and changes in cholesterol levels."[20]

---

[13] *Id.*

[14] https://www.mwra.com/03sewer/html/trac.htm#pretreatment

[15] ATSDR, "Copper: Division of Toxicology ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts132.pdf

[16] ATSDR, "Copper: Division of Toxicology ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts132.pdf

[17] ATSDR, "Cadmium – ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts5.pdf.

[18] ATSDR, "Nickel: Division of Toxicology ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts15.pdf.

[19] *Id.*

156. Chromium deposits in soil and water, and animal studies show that ingestion of chromium can cause ulcers in the stomach and small intestine, anemia, and damage to the male reproductive system.[21]

157. Regarding silver, the ATSDR states: "[e]xposure to high levels of silver for a long period of time may result in a condition called arygria, a blue-gray discoloration of the skin and other body tissues."[22]

158. Changes to pH level can harm waterbodies and aquatic wildlife: fluctuating pH or sustained pH outside the optimal range of 6.5-8 S.U. physiologically stresses many species and can result in decreased reproduction, decreased growth, disease or death, and, ultimately, reduced biological diversity in waterbodies.[23]

159. Even small changes in pH can shift community composition in waterbodies because pH alters the chemical state of many pollutants, including aluminum and mercury.[24]

160. Acidic conditions increase the solubility, transport, and bioavailability of aluminum and mercury, rendering them more toxic and increasing the exposure to aquatic plants and animals.[25]

---

[20] ATSDR, "Zinc: Division of Toxicology ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts60.pdf.
[21] ATSDR, "Chromium – ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts7.pdf.
[22] ATSDR, "Silver: Division of Toxicology ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts146.pdf.
[23] *See* EPA, *pH Fact Sheet*, https://www.epa.gov/caddis-vol2/caddis-volume-2-sources-stressors-responses-ph#low.
[24] *Id.*; The Water Center, University of Pennsylvania, *Impacts of Aluminum on Aquatic Organisms and EPA's Aluminum Criteria*, https://watercenter.sas.upenn.edu/impacts-of-aluminum-on-aquatic-organisms-and-epas-aluminum-criteria/; EPA, *Ambient Water Quality Criteria for Aluminum*, https://www3.epa.gov/npdes/pubs/owm587.pdf; C A Kelly, et. al., *Effect of pH on Mercury Uptake By an Aquatic Bacterium: Implications for Hg Cycling*, Environ Sci Technol. (2003), https://pubmed.ncbi.nlm.nih.gov/12875398/; Michael R. Winfrey, et. al., *Environmental Factors Affecting the Formation of Methylmercury in Low pH Lakes*, Environmental Toxicology and Chemistry, Vol. 9, 853-869 (1990), https://setac.onlinelibrary.wiley.com/doi/pdf/10.1002/etc.5620090705.
[25] EPA, *pH Fact Sheet*, https://www.epa.gov/caddis-vol2/caddis-volume-2-sources-stressors-responses-ph#low.

161. Regarding arsenic, the ATSDR states: "[i]ngesting very high levels of arsenic can result in death. Exposure to lower levels can cause nausea and vomiting, decreased production of red and white blood cells, abnormal heart rhythm, damage to blood vessels, and a sensation of 'pins and needles' in hands and feet."[26]

## HARM TO CLF'S MEMBERS

162. CLF's members visit the Boston Harbor Islands and live and spend time in communities and on beaches spanning the Massachusetts coast from Gloucester to Hull, where effluent from Defendant's facility is carried by ocean currents.

163. Defendant's contributions to water quality degradation and harm to wildlife causes CLF members' reasonable concern for their health because they eat fish caught in Boston Harbor and Massachusetts Bay.

164. Defendant's violations contribute to water quality degradation and harm to wildlife, reducing CLF members' enjoyment of the beaches and waters of Boston Harbor and Massachusetts Bay.

165. CLF's members recreate less in the Boston Harbor and Massachusetts Bay due to Defendant's violations' contributing to water quality degradation and harm to wildlife.

166. Defendant's violations contribute to water quality degradation and harm to wildlife, reducing CLF members' ability to observe aquatic life in the waters of Boston Harbor and Massachusetts Bay.

167. Defendant's violations lead to increased pollutants in the fertilizer it sells to entities including but not limited to municipalities, golf courses, and individuals, resulting in increased pollution in soil and groundwater and causing CLF members reasonable concern for their health.

---

[26] ATSDR, "Arsenic – ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts2.pdf.

## CLAIMS FOR RELIEF

**COUNT I: FAILURE TO ENFORCE**

168. Paragraphs 68–117  are incorporated by reference.

169. MWRA's Enforcement Response Plan states: "[e]ach instance of noncompliance will be met with an enforcement response." Ex. 5 at 10.

170. On information and belief, MWRA has repeatedly failed to respond with any enforcement action to instances of noncompliance by its Industrial Users since at least February 2018.

171. Each failure by MWRA to meet Industrial Users' noncompliance with an enforcement action constitutes a separate and distinct violation of the Clean Water Act, 33 U.S.C. § 1311(a), because each failure violates 40 C.F.R., Part 403, MWRA's Enforcement Response Plan, and MWRA's NPDES Permit.

172. In light of MWRA's history of violations, and its failure to take corrective action, MWRA will continue to violate its NPDES Permit, federal regulations, and the Clean Water Act in the future unless and until enjoined from doing so.

**COUNT II: FAILURE TO COMPLY WITH THE ENFORCEMENT RESPONSE PLAN IN RESPONSE TO SIGNIFICANT NONCOMPLIANCE**

173. Paragraphs 68–117  are incorporated by reference.

174. MWRA's Enforcement Response Plan states that MWRA will issue a notice of noncompliance ("NON") or an order for "significant noncompliance" with a discharge limit. Ex. 5 at 5–6.

175. The Enforcement Response Plan states: "[m]ore serious violations will be met with more severe initial responses than less serious violations." Ex. 5 at 6.

176. On information and belief, MWRA has repeatedly failed to comply with the Enforcement Response Plan when responding to Industrial Users' significant noncompliance due to discharge limit violations since at least February 2018.

177. Each failure by MWRA to comply with the Enforcement Response Plan in its response to significant noncompliance constitutes a separate and distinct violation of the Clean Water Act, 33 U.S.C. § 1311(a), because each failure violates 40 C.F.R., Part 403, MWRA's Enforcement Response Plan, and MWRA's NPDES Permit.

178. In light of MWRA's history of violations, and its failure to take corrective action, MWRA will continue to violate its NPDES Permit, federal regulations, and the Clean Water Act in the future unless and until enjoined from doing so.

## COUNT III: FAILURE TO ESCALATE ENFORCEMENT RESPONSE

179. Paragraphs 68–117  are incorporated by reference.

180. MWRA's Enforcement Response Plan states that MWRA will issue a Notice of Violation "within 10 working days of discovering a violation" for an isolated exceedance of a discharge limit or a second violation (where the User violates a limit associated with a different parameter or in a non-consecutive term).

181. After a Notice of Violation, the Enforcement Response Plan states that MWRA will respond to a repeat exceedance of a discharge limit with either a notice of noncompliance or an order.

182. After a notice of noncompliance or an order, the Enforcement Response Plan states that MWRA will issue a penalty assessment notice ("PAN").

183. On information and belief, MWRA has regularly failed to escalate its enforcement responses for repeated discharge violations of the same parameter and/or in a consecutive year since at least February 2018.

184. Each failure by MWRA to escalate its enforcement response for a repeated discharge violation of the same parameter and/or in a consecutive year constitutes a separate and distinct violation of the Clean Water Act, 33 U.S.C. § 1311(a), because each failure violates 40 C.F.R., Part 403, MWRA's Enforcement Response Plan, and MWRA's NPDES Permit.

185. In light of MWRA's history of violations, and its failure to take corrective action, MWRA will continue to violate its NPDES Permit, federal regulations, and the Clean Water Act in the future unless and until enjoined from doing so.

**COUNT IV: FAILURE TO ASSESS PENALTIES**

186. Paragraphs 68–117  are incorporated by reference.

187. MWRA's Enforcement Response Plan states that MWRA "will" issue a Penalty Assessment Notice ("PAN") "when a user violates a NON and/or Order."

188. On information and belief, MWRA has repeatedly failed to issue Penalty Assessment Notices when Users violate Notices of Noncompliance or Orders since at least February 2018.

189. Each failure by MWRA to issue Penalty Assessment Notices for an Industrial User's violation of a Notice of Noncompliance or an Order constitutes a separate and distinct violation of the Clean Water Act, 33 U.S.C. § 1311(a), because each failure violates 40 C.F.R., Part 403, MWRA's Enforcement Response Plan, and MWRA's NPDES Permit.

190. In light of MWRA's history of violations, and its failure to take corrective action, MWRA will continue to violate its NPDES Permit, federal regulations, and the Clean Water Act in the future unless and until enjoined from doing so.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court grant the following relief:

a. Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Defendant has violated and remains in violation of its NPDES permit, 40 C.F.R., Part 403, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) as alleged in Counts I, II, II, and IV of this Complaint;

b. Issue an injunction requiring Defendant to remediate all identified violations through direct implementation of the EPA-approved Enforcement Response Plan and to take steps required to achieve and maintain compliance with the Permit, the Clean Water Act, and the relevant regulations;

c. Impose civil penalties on Defendant of up to $56,460 per day per violation pursuant to Sections 505(a) and 309(d) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and 1319(d) and 40 C.F.R. §§ 19.1–19.4;

d. Award Plaintiff's costs of litigation, include reasonable attorney and expert witness fees, as provided under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e. Grant all other relief that justice may require.

Dated: April 27, 2022

Respectfully submitted,

*/s/ Heather A. Govern*
Heather A. Govern, Esq. (BBO# 688482)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 850-1765
hgovern@clf.org

ATTORNEY FOR PLAINTIFF