

For a thriving New England

CLF Massachusetts    62 Summer Street
Boston MA 02110
P: 617.350.0990
F: 617.350.4030
www.clf.org

February 23, 2022

**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

Frederick A. Laskey, Executive Director
Massachusetts Water Resources Authority
Charlestown Navy Yard
100 First Avenue, Building 39
Boston, MA 02129

**RE:    Notice of Intent to File Suit Against the Massachusetts Water Resources Authority for Violations of the Clean Water Act**

Dear Mr. Laskey:

      The Conservation Law Foundation and its members ("CLF")[1] hereby give notice to the Massachusetts Water Resources Authority and its agents and directors (collectively, "MWRA") of intent to file suit pursuant to Section 505 of the Federal Water Pollution Control Act ("Clean Water Act," "CWA," or "Act"), 33 U.S.C. § 1365(a), for violations of the Act specified below. This letter constitutes notice pursuant to 40 C.F.R., Part 135 (the "Notice") to the addressed persons of CLF's intention to file suit in the United States District Court of the District of Massachusetts seeking appropriate equitable relief, civil penalties, and other relief no earlier than 60 days from the postmark date of this Notice letter.

      The subject of this action is MWRA's repeated failure to enforce its industrial pretreatment program as required under 40 C.F.R., Part 403. Based on publicly available information, MWRA has violated, is violating, and will continue to violate the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., the Act's implementing regulations, and MWRA's National Pollutant Discharge Elimination System ("NPDES") Permit No. MA0103284, by failing to follow the escalating enforcement procedures outlined in the federally-approved Enforcement Response Plan.

---

[1] CLF is a not-for-profit 501(c)(3) organization dedicated to the conservation and protection of New England's environment. Its mission includes safeguarding the health and quality of life of New England communities facing the adverse effects of polluted waterways. CLF's membership includes individuals who live and recreate near and in the Massachusetts Bay and Boston Harbor. CLF's members' health, enjoyment, and well-being are harmed by MWRA's violations of the CWA.

## RESPONSIBLE ENTITY

MWRA is a Massachusetts public authority established by an enabling act passed in 1984.[2] MWRA provides wholesale water and sewer services to 3.1 million people and over 5,500 large industrial users throughout eastern and central Massachusetts.[3] MWRA has 65 different facilities that make up the wastewater system. MWRA is the authority that oversees and coordinates the preliminary primary and secondary treatment to its wastewater flows at the Deer Island and Clinton Treatment Plants.[4]

MWRA is the "person," as defined by 33 U.S.C. § 1362(5), responsible for the violations alleged in this Notice. MWRA's Deer Island Treatment Plant, located at 190 Tafts Ave., Winthrop, MA 02152, is a Publicly Owned Treatment Works as defined by the CWA.[5] EPA issued NPDES Permit No. MA0103284 to MWRA for the operation of the Deer Island Treatment Plant.[6]

## BACKGROUND

In implementing the CWA, EPA established the National Pretreatment Program to address indirect discharges from industries to Publicly-Owned Treatment Works ("POTWs").[7] The National Pretreatment Program was established, in part, because of the known negative effects of wastewater to receiving waters—and to curb the potential harm to human and aquatic life, as well as to land.[8]

The National Pretreatment Program requires certain POTWs to develop pretreatment programs for pollutants from industrial users.[9] A POTW's pretreatment program is subject to EPA approval and incorporated into the POTW's NPDES permit.[10] Before discharging wastewater to a POTW, an industrial user must obtain a permit from the POTW specifying the requirements to pretreat or otherwise control pollutants in its wastewater.

In addition, the National Pretreatment Program requires POTWs to develop and implement enforcement response plans.[11] The "plan shall contain detailed procedures indicating how a POTW will investigate and respond to instances of industrial user noncompliance." The plan, at a minimum, shall:

---

[2] 1984 Chap. 0372.
[3] MWRA, "About MWRA," available at https://www.mwra.com/02org/html/whatis.htm.
[4] MWRA, "How the Sewer System Works: How Does Sewage Treatment Work?," available at https://www.mwra.com/03sewer/html/sewhow.htm.
[5] NPDES Permit No. MA0103284 at 1; 40 CFR § 403.3(q) (POTW definition).
[6] NPDES Permit No. MA0103284.
[7] 40 CFR § 403.1; EPA, Introduction to the National Pretreatment Program, June 2011, available at https://www.epa.gov/sites/default/files/2015-10/documents/pretreatment_program_intro_2011.pdf at iii (hereinafter "NPP Introduction").
[8] NPP Introduction at iii-iv.
[9] 40 CFR § 403.8(a). A POTW is a "Control Authority" once EPA has approved its pretreatment program. 40 CFR § 403.3(f); NPP Introduction at iii, ix.
[10] 40 CFR § 403.8(b)-(c).
[11] 40 CFR § 403.8(f)(5).

> (i) Describe how the POTW will investigate instances of noncompliance;
>
> **(ii) Describe the types of escalating enforcement responses the POTW will take in response to all anticipated types of industrial user violations and the time periods within which responses will take place**;
>
> (iii) Identify (by title) the official(s) responsible for each type of response;
>
> (iv) Adequately reflect the POTW's primary responsibility to enforce all applicable pretreatment requirements and standards, as detailed in 40 CFR 403.8 (f)(1) and (f)(2).

40 C.F.R. § 403.8(f)(5) (emphasis added).

Massachusetts state regulations, 360 CMR 2.11, establish the enforcement options available to the MWRA where industrial users are in violation of the Sewer Use rules and regulations, 360 CMR 10. The enforcement options include:

> Whenever, on the basis of any available information, the Authority finds that a Person has violated, is violating, or threatens to violate 360 CMR 10.000: Sewer Use, any Notice of Noncompliance, order, or Permit issued pursuant to Authority regulations, . . . the Authority may take one or more of the following actions:
>
> (1) Issue a Notice of Noncompliance;
> (2) Issue an administrative order requiring any action the Authority is authorized to require;
> (3) Assess a civil administrative penalty;
> (4) Issue or modify a Permit under 360 CMR 10.000: Sewer Use with schedules of compliance or other requirements as necessary to bring the permittee into compliance or prevent further violations, or both;
> (5) Revoke, deny, suspend, or refuse to renew a Permit issued under 360 CMR 10.000: Sewer Use….

**MWRA'S PRE-TREATMENT PROGRAM AND ENFORCEMENT RESPONSE PLAN**

MWRA's NPDES permit includes an EPA-approved industrial pretreatment program.[12] Accordingly, MWRA was required to adopt and implement an Enforcement Response Plan, which EPA approved in 1992.[13]

---

[12] NPDES Permit MA0103284 at 22 ("MWRA shall implement an industrial pretreatment program (IPP) as required by 40 CFR Part 403. The industrial pretreatment program shall be operated in accordance with MWRA's approved pretreatment program plan and 40 CFR Part 403. At a minimum, MWRA shall perform the following activities in implementing and operating its industrial pretreatment program . . . Obtain appropriate remedies for noncompliance by any industrial user with any pretreatment standard and/or requirement").

[13] MWRA, "MWRA Submission of Revised Enforcement Response Plan for Toxic Reduction and Control Department," 2017 (The Enforcement Response Plan "has been revised to incorporate changes made in MWRA's

The Enforcement Response Plan contains detailed procedures indicating how MWRA will investigate and respond to instances of industrial user noncompliance, specifically pertaining to Significant Industrial Users ("SIUs").[14] In the Enforcement Response Plan, MWRA outlines its responsibilities regarding pretreatment program violations in an escalating schedule of enforcement actions.[15]

Once alerted to a violation, MWRA Enforcement Section staff "determine what type of enforcement action is required" based on factors including: "the nature of the violation (pretreatment standards, reporting (late or deficient) compliance schedules); frequency of the violation (isolated or recurring); potential impact of the violation (e.g., interference, pass through, or POTW worker safety); … economic benefit gained by the violator";[16] "[g]ood faith of the industrial user";[17] and reports stored on MWRA's Pretreatment Information Management System , which is operated by the Toxic Reduction and Control ("TRAC") Department, regarding MWRA site inspections.[18]

The Enforcement Response Plan states that "[e]ach instance of noncompliance **will be** met with an enforcement response" that "may be formal or informal."[19] For exceedances of discharge limits, the Enforcement Response Plan identifies the "enforcement response options" available to MWRA depending on the "nature of the violation" by the user:

Table 1: Discharge Violations[20]

| Nature of Violation | Enforcement Response Option |
| --- | --- |
| Isolated, 1st or 2nd violation (non-consecutive or different parameters) | NOV withing 10 working days of discovery |
| Repeated or frequent violations | NON/Order within 45 days of receipt of results of repeat sampling following NOV; PAN and SOC within 60 days of noncompliance with NON/Order; NPPR; civil referral |
| Significant Noncompliance | NON/Order within 60 days of SNC determination; PAN and SOC within 60 days of discovery of continuing violations after NON/Order or Ruling; NPPR within 60 days of noncompliance with SOC |

---

Toxics Reduction and Control (TRAC) Department's pretreatment program since the original Enforcement Response Plan was approved in 1992.").
[14] *See* MWRA, "SIU Definition," available at https://www.mwra.com/03sewer/html/siudef.pdf; 40 CFR § 403.3(v).
[15] MWRA, Enforcement Response Plan at 1.
[16] *Id*. at 4.
[17] *Id*. at 6.
[18] *Id*. at 3.
[19] *Id*. at 5 (emphasis added).
[20] *Id.* at 10 ("Enforcement Response Guide: Discharge Violations").

The Enforcement Response Plan also identifies the enforcement response options available to MWRA for its users' sampling and reporting violations, depending on the noncompliance and the nature of the violation:

Table 2: Sampling and Reporting Violations[21]

| Noncompliance | Nature of Violation | Enforcement Response Option |
|---|---|---|
| Sampling or reporting deficiencies | Isolated or infrequent (1st or 2nd violation) | NOV withing 10 working days of discovery |
| | Frequent (3rd violation in the last 2 years) or persistent | NON/Order within 45 days; PAN within 60 days of violation of NON/Order |
| Complete failure to sample or report | Significant Noncompliance | NOV withing 10 working days of discovery of failure to receive report; NON/Order within 45 days of noncompliance with NOV; PAN and SOC within 60 days of compliance due date with NON Order; NPPR |

The Enforcement Response Plan states that penalty assessment notices ("PANs") "will be issued when a user violates a NON and/or Order, and may be issued for other violations that the MWRA deems serious…."[22] The Enforcement Response Guide within the Enforcement Response Plan clarifies that the second step for a user in significant noncompliance, after issuing an NON following the first instance, is to issue a "PAN and SOC within 60 days of discovery of continuing violations after NON/Order or Ruling." [23]

**HARM CAUSED BY POLLUTANTS DISCHARED BY VIOLATORS**

Many of the violations that MWRA fails to respond to properly are exceedances of the limits for pollutants that harm water quality and endanger wildlife and human health. These include, among others, mercury, zinc, and pH pollution.

MWRA is aware of the dangers that mercury poses. On its own website, MWRA states that mercury "can be highly toxic and is known to bioaccumulate (build up) in fish and (potentially) humans and marine mammals who consume these fish."[24] According to the Agency of Toxic Substances and Disease Registry ("ATSDR"), zinc builds up in fish. [25] Exposure to large amounts of zinc can cause "stomach cramps, anemia, and changes in cholesterol levels." [26]

---

[21] *Id.* at 11 ("Enforcement Response Guide: Sampling and Reporting Violations").
[22] *Id.* at 7.
[23] *Id.* at 10.
[24] MWRA, "Which pollutants create the most concern for TRAC?" available at https://www.mwra.com/03sewer/html/trac.htm#reports.
[25] ATSDR, "Zinc: Division of Toxicology ToxFAQs," available at https://www.atsdr.cdc.gov/toxfaqs/tfacts60.pdf.
[26] *Id.*

Fluctuating pH or sustained pH outside the optimal range of 6.5-8 S.U. physiologically stresses many species and can result in decreased reproduction, decreased growth, disease or death, and, ultimately, reduced biological diversity in waterbodies.[27] Even small changes in pH can shift community composition in waterbodies because pH alters the chemical state of many pollutants, including aluminum and mercury.[28] Acidic conditions increase the solubility, transport, and bioavailability of these pollutants, thereby rendering them more toxic and increasing the exposure of aquatic plants and animals.[29]

## **VIOLATIONS OF FEDERAL LAW**

The following sections list MWRA's violations of the CWA, its implementing regulations, and MWRA's NPDES permit.

*1.   Non-Enforcement*

MWRA's Enforcement Response Plan states: "[e]ach instance of noncompliance will be met with an enforcement response."[30] Since January 2017, MWRA has not responded with any enforcement action to at least 70 instances of noncompliance by SIUs. Of those 70 instances, 15 were deemed "significant noncompliance."

MWRA's failure to take any enforcement action for an SIU's noncompliance violates the requirements of 40 C.F.R., Part 403, the Enforcement Response Plan and industrial pretreatment program incorporated into its NPDES permit, and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

*2.   Failure to Take Proper Enforcement in Response to Significant Noncompliance*

According to its Enforcement Response Plan, MWRA will issue a notice of noncompliance ("NON") or an order for "significant noncompliance" with a discharge limit.[31] The plan is clear that "[m]ore serious violations will be met with more severe initial responses than less serious violations"[32] and that discharge violations by SIUs are second on MWRA's enforcement priority list, after only "[p]resent or imminent danger."[33]

---

[27] EPA, *pH Fact Sheet*, https://www.epa.gov/caddis-vol2/caddis-volume-2-sources-stressors-responses-ph#low.
[28] *Id.*; The Water Center, University of Pennsylvania, *Impacts of Aluminum on Aquatic Organisms and EPA's Aluminum Criteria*, https://watercenter.sas.upenn.edu/impacts-of-aluminum-on-aquatic-organisms-and-epas-aluminum-criteria/; EPA, *Ambient Water Quality Criteria for Aluminum*, https://www3.epa.gov/npdes/pubs/owm587.pdf; C A Kelly, et. al., *Effect of pH on Mercury Uptake By an Aquatic Bacterium: Implications for Hg Cycling*, Environ Sci Technol. (2003), https://pubmed.ncbi.nlm.nih.gov/12875398/; Michael R. Winfrey, et. al., *Environmental Factors Affecting the Formation of Methylmercury in Low pH Lakes*, Environmental Toxicology and Chemistry, Vol. 9, 853-869 (1990), https://setac.onlinelibrary.wiley.com/doi/pdf/10.1002/etc.5620090705.
[29] EPA, *pH Fact Sheet*, https://www.epa.gov/caddis-vol2/caddis-volume-2-sources-stressors-responses-ph#low.
[30] MWRA, Enforcement Response Plan at 11.
[31] *Id*. at 5-6.
[32] *Id*. at 6.
[33] *Id*. at 4-5.

In fiscal years 2017–2021, SIUs were in significant noncompliance with their discharge limits on at least 123 occasions. Of those 123 instances of significant noncompliance, MWRA failed to respond with an NON at least 83 times.[34] In most instances, MWRA responded to an SIU's significant noncompliance with only a notice of violation ("NOV"). (An NOV is a less severe enforcement response than an NON and the Enforcement Response Plan does not identify an NOV as an enforcement option for significant noncompliance).

MWRA's failure to take appropriate enforcement action for an SIU's significant noncompliance violates the requirements of 40 C.F.R., Part 403, the Enforcement Response Plan and industrial pretreatment program incorporated into its NPDES permit, and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

3.  *Non-Escalation of Enforcement Response*

According to its Enforcement Response Plan, MWRA will issue an NOV "within 10 working days of discovering a violation" for an isolated exceedance of a discharge limit or a second violation (where the SIU violates a limit associated with a different parameter or in a non-consecutive term).[35] Following an initial NOV, a repeat exceedance of discharge limits elicits either an NON or an order.[36] Following an NON or an order, MWRA will issue a penalty assessment notice ("PAN").[37]

MWRA has regularly failed to escalate its enforcement responses for repeated discharge violations of the same parameter and/or in a consecutive year. Publicly available information shows that since 2017, MWRA has failed to escalate its enforcement for repeated violations by SIUs in at least 46 instances.

Moreover, enforcement trend data indicates that the actual number of failures to properly escalate enforcement is much higher. In fiscal years 2017–2021, there were at least 164 instances of significant noncompliance by SIUs, yet MWRA issued only 45 responses stronger than an NOV to SIUs: 40 NONs, one administrative settlement, one PAN, two notices of proposed permit suspensions, and one supplemental order to comply.[38] In that same period, MWRA issued over 300 of warnings to its users for gas/oil separator violations[39] and there is no

---

[34] MWRA, "TRAC Industrial Waste Report," Oct. 2017, available at https://www.mwra.com/annual/tracindustrialwastereport/iwr-2017.pdf ("2017 IWR"); MWRA, "TRAC Industrial Waste Report," Rev. Dec. 2018, available at https://www.mwra.com/annual/tracindustrialwastereport/iwr-2018.pdf ("2018 IWR"); MWRA, "TRAC Industrial Waste Report," Oct. 2019, available at https://www.mwra.com/annual/tracindustrialwastereport/iwr-2019.pdf ("2019 IWR"); MWRA, "TRAC Industrial Waste Report," Oct. 2020, available at https://www.mwra.com/annual/tracindustrialwastereport/iwr-2020.pdf ("2020 IWR"); MWRA, "TRAC Industrial Waste Report," Oct. 2021, available at https://www.mwra.com/annual/tracindustrialwastereport/iwr-2021.pdf ("2021 IWR").
[35] MWRA, Enforcement Response Plan at 10 (see chart titled, "Massachusetts Water Resources Authority, Enforcement Response Guide").
[36] *Id*.
[37] *Id*. at 10.
[38] 2017 IWR; 2018 IWR; 2019 IWR; 2020 IWR; 2021 IWR.
[39] 2017 IWR; 2018 IWR; 2019 IWR; 2020 IWR; 2021 IWR.

indication that MWRA ever escalated its response beyond a warning letter.[40] In fiscal year 2018, MWRA did not escalate any enforcement responses above an NON for any of its 1,250 users.[41]

4.   *Failure to Assess Penalties*

MWRA's deficient enforcement practices has led to insufficient penalty assessments. According to its Enforcement Response Plan, MWRA "will" issue a penalty assessment notice ("PAN") "when a user violates a NON and/or Order." MWRA's failures to take any enforcement action, appropriate enforcement action, or escalate its enforcement action caused fewer users to reach the penalty assessment stage of enforcement.

In fiscal years 2017–2021, MWRA issued only 23 PANs.[42] Of those, only one PAN was issued to an SIU, and only five were issued after 2017.[43] In 2017, MWRA collected $122,750 in penalties, of which $100,000 was paid by one SIU, $15,000 was paid by another SIU, and the remaining penalties were $1,000 or less. [44]

In 2018, MWRA collected one penalty of $1,000. In 2019, MWRA collected $14,000, of which $5,000 was paid by one SIU. In 2020, MWRA collected $50,000 in penalties, of which $14,000 was paid by one SIU and the remainder was a single user's outstanding penalty from a prior year.[45]

In 2021, MWRA collected no penalties.[46]

**DATES OF VIOLATIONS**

Since at least January 2017, MWRA has repeatedly failed to enforce the permits it oversees through its Pretreatment Program. Each failure by MWRA to take appropriate enforcement action for users' noncompliance violates the requirements of 40 C.F.R., Part 403 and the terms of MWRA's NPDES Permit, constitutes a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

MWRA's CWA violations are ongoing and continuous. Barring a change in its enforcement practices and full compliance with its NPDES permit, MWRA's violations will continue indefinitely. This letter serves as notice of CLF's intent to sue for the types of violations described herein that occurred in or after January 2017.

---

[40] The Enforcement Response Plan contains a schedule of enforcement for gas/separator violations that includes escalating actions with continued violations. MWRA, "Enforcement Response Guide: Gas/Oil Separator Violations," Enforcement Response Plan at 15-16.
[41] 2018 IWR at 3, 6.
[42] 2017 IWR; 2018 IWR; 2019 IWR; 2020 IWR; 2021 IWR.
[43] 2017 IWR.
[44] *Id.*
[45] 2019 IWR; 2020 IWR.
[46] 2018 IWR; 2021 IWR.

**RELIEF REQUESTED**

MWRA is liable for the above-described violations. Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $56,460 per day per violation for all violations occurring after November 2, 2015, where penalties are assessed on or after December 23, 2020, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1365(a); and 40 C.F.R. §§ 19.1–19.4. CLF will seek the full penalties allowed by law.

In addition to civil penalties, CLF will seek declaratory and injunctive relief to prevent further violations of the Clean Water Act pursuant to Sections 505(a), 33 U.S.C. § 1365(a), and such other relief as permitted by law. CLF will seek an order from the Court requiring MWRA to remediate all identified violations through direct implementation of the EPA-approved Enforcement Response Plan. Lastly, pursuant to Section 505(d) of the Act, 33 U.S.C. § 1365(d), CLF will seek recovery of costs and fees associated with this matter.

**CONCLUSION**

During the 60-day notice period, CLF is willing to discuss effective remedies for the violations noted in this letter that may avoid the necessity of further litigation. If you wish to pursue such discussions, please have your attorney contact Heather Govern by March 16, 2022 so that negotiations may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing at the conclusion of the 60 days.

Sincerely,

*[signature]*

Heather A. Govern, Esq.
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 850-1765

CC: By certified mail – return receipt requested

Michael S. Regan, Administrator
Environmental Protection Agency
Office of the Administrator, 1101A
1200 Pennsylvania Ave, NW
Washington, DC 20460

David Cash, Regional Administrator
Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100
Boston, MA 02109-3912

Martin Suuberg, Commissioner
Massachusetts Department of Environmental Protection
One Winter Street, 2nd Floor
Boston, MA 02108

Citizen Suit Coordinator
Environmental & Natural Resources Division
Law and Policy Section
P.O. Box 7415
Ben Franklin Station
Washington, D.C. 20044-07415