UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-10626-RGS

CONSERVATION LAW FOUNDATION, INC.

v.

MASSACHUSETTS WATER RESOURCES AUTHORITY

MEMORANDUM AND ORDER
ON DEFENDANT'S MOTION TO DISMISS

February 17, 2023

STEARNS, D.J.

Conservation Law Foundation, Inc. (CLF), a venerable New England environmental advocacy group and an original plaintiff in the Boston Harbor cleanup case, brought this citizen suit against the Massachusetts Water Resources Authority (MWRA) under the Clean Water Act (CWA).[1] CLF seeks to hold the MWRA liable for allegedly violating its National Pollutant Discharge Elimination System (NPDES) permit by failing to take sufficient

---

[1] The Clean Water Act, or as it is formally styled, the Federal Water Pollution Control Act Amendments of 1972, is a cornerstone of the federal effort to reverse centuries of environmental degradation and neglect of our public waters.  The CWA underwent significant amendment in 1977 and 1987; the original 1972 Act, however, still constitutes the skeletal framework of the law.

enforcement action against its industrial users, whom CLF contends have violated pollutant parameters and other permit conditions. The MWRA now moves to dismiss the Complaint for failure to state a claim, invoking Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

This case is another chapter in the enduring effort to restore the pristineness of Boston Harbor, an effort which the federal court has overseen since shortly after the creation of the MWRA by the Massachusetts Legislature in 1984. The foundation for federal oversight was laid in September of 1985, when Judge A. David Mazzone, after consolidating CLF's original 1983 case against the Metropolitan District Commission with a parallel case brought by the Environmental Protection Agency (EPA), found the MWRA in violation of the CWA. Judge Mazzone ordered a series of steps — "milestones" — which (with occasional adjustments) have guided the course of the cleanup for the past thirty-seven years.

Under the CWA, a state is required to set water quality standards for bodies of water within its boundaries. 33 U.S.C. § 1313. Once these standards are defined, the state determines which water bodies do not meet the quality standards for each of a list of pollutants. *Id.* § 1313(d)(1)(A). If a pollutant exceeds the acceptable level, the state must then establish the "total

maximum daily load" (TMDL) of the pollutant that the water body can absorb and still meet water quality standards.  *Id.* § 1313(d)(1)(C).  TMDLs allocate the daily load between point sources (such as a pipe or ditch, *id.* § 1362(14)) and all other sources.  Once a TMDL is established, it is submitted to the EPA for approval.  *Id.* § 1313(d)(2).

The CWA also establishes a permitting system for the discharge of pollutants from point sources.  *Id.* §§ 1311(a), 1342(a).  Under the NPDES, dischargers must obtain a permit that, among other restrictions, limits the quantity and type of pollutants that can be discharged into a protected body of water.  40 C.F.R. § 122.1(b).  These limits must be "consistent with the assumptions and requirements of any available wasteload allocation for the discharge" set by the relevant TMDL.  *Id.* § 122.44(d)(1)(vii)(B).

The MWRA, which is chartered as an independent agency of the Commonwealth, provides clean drinking water as well as sewage and water treatment services to customers in eastern and central Massachusetts.  A critical component of the sewage services is the MWRA's Deer Island sewage treatment plant.  Deer Island is the second largest facility of its kind in the United States and is designed at peak capacity to process as much as 1.35 billion gallons of wastewater per day.  In addition to processing sewage from

households, the MWRA system receives wastewater discharged by industrial users.

In prescribing the remedial steps to be taken to achieve a permanent cleanup of Boston Harbor, Judge Mazzone ordered the MWRA to implement an Industrial Pretreatment Program, including an EPA-approved Enforcement Response Plan (ERP), setting out the criteria by which the MWRA is to investigate and respond to discharging violations by industrial users.

In this lawsuit, brought under the CWA's citizen-suit provision, 33 U.S.C. § 1365, CLF challenges the MWRA's alleged non-enforcement of industrial user violations of the CWA.  CLF alleges that the MWRA itself is in violation of section 1311(a) of the CWA, because of its failure to comply with the conditions of its NPDES permit and its ERP.  These, CLF argues, require the MWRA to undertake an enforcement action whenever an industrial user violates its discharge permit, with penalties commensurate in severity to the gravity of the violation.  *See* Compl. (Dkt # 1) ¶¶ 119-121.  According to CLF, the MWRA has failed to "take an enforcement action following Industrial User noncompliance at least 70 times" and has failed to "take the required level of enforcement action following significant noncompliance by an Industrial User at least 83 times" during the past five years.  *Id.* ¶¶ 122, 124.

Further, CLF alleges that the MWRA has frequently failed to escalate enforcement actions for repeated industrial user violations and to issue penalties to industrial users consistent with the requirements of its ERP. *Id.* ¶¶ 126, 128.

## DISCUSSION

The MWRA moves to dismiss CLF's Complaint pursuant to Fed. R. Civ. P. 12(b)(6). The court will dismiss a complaint if, after accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of a plaintiff, it determines that the complaint "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion to dismiss stage, the court may take into consideration "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint," in addition to the complaint's allegations. *Schaer v. Brandeis Univ.*, 432 Mass. 474, 477 (2000), quoting 5A Wright & Miller, Federal Practice and Procedure § 1357, at 299 (1990).

### A.    Statutory Authorization to Sue

The MWRA first contends that CLF does not have statutory authorization to sue under its theory of liability.[2]   As a rule, sovereign

_____

[2] CLF points out that the MWRA incorrectly characterized its argument as raising a question of standing.  *See* Pl.'s Opp'n to Mot. to Dismiss (Pl.'s Opp'n) (Dkt # 13) at 4; Def.'s Mem. Supp. Mot. to Dismiss (Def.'s Mem.) (Dkt

immunity bars suits against government agencies and their officials. *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 57 (1st Cir. 2007). Congress may waive that immunity, and it has done so under the CWA by providing that any citizen is authorized to bring a civil action on his or her own behalf against any person "who is alleged to be in violation of an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). The citizen-suit provision, which was modeled on a similar provision in the Clean Air Act, is intended as "a supplemental and effective assurance that the Act would be implemented and enforced." *Nat. Res. Def. Counsel, Inc. v. Train*, 510 F.2d 692, 700 (D.C. Cir. 1975). The statutory authorization to bring a private suit, however, is not a *carte blanche. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60 (1987) (the role of the citizen suit is to "supplement rather than to supplant" the government as the chief enforcement authority). For example, citizens may not bring suit where the EPA has instituted and is "diligently" prosecuting a court action against the violator. 33 U.S.C. § 1365(b)(1)(B).[3] The Act also restricts citizens suits

---

# 12) at 4-7. As CLF explains, the issue is whether CLF has the statutory authority to bring this action under the CWA's citizen-suit provision.

[3] Courts disagree as to whether independent action taken by an agency qualifies as a "court action" and thus precludes a citizen suit. *Compare Friends of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 62 (2d Cir. 1985) (where the CWA unambiguously refers to a court action, "[i]t would be

to enumerated violations of the CWA.  *See id.* § 1365(f).  As one court has explained, these restraints are intended to curb excessive litigation that might frustrate the efficient implementation of the CWA.  *Train*, 510 F.2d at 700; *see also* Jonathan S. Campbell, *Has the Citizen Suit Provision of the Clean Water Act Exceeded its Supplemental Birth?*, 24 Wm. & Mary Envtl. L. & Pol'y Rev. 305, 335 (2000) ("The Clean Water Act never intended to supply an angry citizen plaintiff with a means to gain revenge on a polluting company.").

CLF asserts that the MWRA's alleged failure to comply with its ERP, and by extension its NPDES permit, is a patent violation of 33 U.S.C. §§ 1311(a) and 1342(k), both of which fall within reach of the citizen-suit provision, *id.* § 1365(f)(1).  Section 1311(a) prohibits any pollutant discharge in violation of sections 1311, 1316, 1317, 1328, 1342, and 1344 of the CWA. Section 1342(k), for its part, requires strict compliance with NPDES permits.

The MWRA ripostes that CLF is not alleging that it discharged pollutants in violation of its NPDES permit but rather that its enforcement response to violations by industrial users was inadequate.  Def.'s Mem. at 5.

---

inappropriate to expand this language to include administrative enforcement actions"), *with Baughman v. Bradford Coal Co.*, 592 F.2d 215, 218 (3d Cir. 1979) (an agency action sufficiently similar to a court proceeding may suffice to preclude a citizen suit).

The right of enforcement oversight, the MWRA argues, is vested exclusively in the EPA under 33 U.S.C. § 1319(f), which grants the EPA Administrator discretion to sue a publicly owned treatment works (POTW) when the EPA believes that it has failed to take an appropriate enforcement action.[4]

The MWRA argues that, because Congress specifically vested this discretionary right of review in the EPA Administrator, the fact that a parallel right was not specifically granted to private citizens precludes citizen suits seeking to enforce the provisions of an ERP.  Def.'s Mem. at 6.  CLF counters that the citizen-suit provision should be interpreted to allow challenges to the MWRA's implementation of its ERP, relying on the fact that Congress erected explicit bars to citizen suits in the CWA but did not include challenges to a POTW's implementation of its ERP among the prohibitions. *See* 33 U.S.C. § 1365(b) (identifying specific instances in which a citizen suit cannot be brought).  It follows, CLF contends, that under the statutory interpretation canon *expressio unius est exclusio alterius*, Congress did not

---

[4] *See* 33 U.S.C. § 1319(f) ("Whenever . . . the Administrator finds that an owner or operator of any source is . . . in violation of subsection (d) of section 1317 of this title, the Administrator *may* notify the owner or operator of such treatment works and the State of such violation.  If the owner or operator of the treatment works does not commence appropriate enforcement action within 30 days of the date of such notification, the Administrator *may* commence a civil action for appropriate relief . . . .") (emphasis added).

intend to create any additional exceptions to the right of citizens to bring suit under the CWA.

It is true that, under a plain reading of the relevant statutes, neither section 1365 nor section 1319(f) of the CWA explicitly states that the EPA Administrator's right to review a POTW's ERP is exclusive.  The parties also do not point to, nor can the court locate, any legislative history addressing the issue that would point in one direction or the other.  Given the lack of any answer in the plain text or legislative history, the court will turn to external considerations.

As an initial matter, it is telling that, despite decades of litigation involving the citizen-suit provision of the CWA, CLF can point to no precedential opinion authorizing a citizen suit under section 1319(f).  The two cases that CLF marshals involve subpart (d) of section 1319, which pertains to civil penalties and injunctive relief but does not enumerate a right to privately enforce an ERP.  For example, *Blackstone Headwaters Coalition, Inc. v. Gallo Builders, Inc.*, 32 F.4th 99 (1st Cir. 2022) (en banc), holds that section 1319(g)(6)(A), which precludes a citizen suit seeking the imposition of a civil penalty after the EPA Administrator has brought an action, does not bar citizen claims for declaratory relief and prospective injunctive relief pursuant to section 1319(d) where an ongoing violation of the CWA is

9

alleged, *id.* at 103, 110.  Similarly, *California v. United States Department of Navy*, 845 F.2d 222 (9th Cir. 1988), holds that section 1365 permits citizens as well as the EPA Administrator to seek civil penalties under section 1319(d), *id.* at 225.  But neither case addresses the discretionary authority section 1319(f) vests in the Administrator to review and enforce an ERP.[5]

The First Circuit's discussion of the role of the EPA in enforcing the CWA provides this court with some guidance.  As the First Circuit noted, "'[c]itizen suits are,' as a general matter, 'an important *supplement* to government enforcement of the Clean Water Act, given that the government has only limited resources to bring its own enforcement actions.'" *Blackstone*, 32 F.4th at 108 (emphasis added), quoting *Atl. States Legal*

---

[5] CLF cites *Conservation Law Foundation v. City of Fall River*, 1990 WL 106751 (D. Mass. July 24, 1990), as supporting authority. But there, the defendant in *Fall River* did not raise the issue of statutory authorization. *Id.* at *3.  Moreover, in *Fall River*, CLF challenged Fall River's failure to adopt an ERP at all, not the implementation of an ERP. *Id.* at *15-16.

At oral argument, CLF offered two additional district court cases in which the court permitted a citizen suit based in part on a POTW's failure to enforce violations of its industrial user to proceed. *See FreshWater Accountability Proj. v Patriot Water Treatment, LLC*, 2018 WL 417305, at *1 (N.D. Oh. July 13, 2018); *Stephens v. Koch Foods, LLC*, 667 F. Supp. 2d 768 (E.D. Tenn. 2009).  But even if these cases had precedential value, neither addresses the issue of whether section 1319(f) vests an exclusive right in the EPA Administrator to challenge the adequacy of a POTW's enforcement actions. *See also* Def.'s Letter (Dkt # 26) at 1-2 (noting that neither *Freshwater* nor *Koch* addresses section 1319(f)'s preclusive effect or lack thereof).

*Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1136 (11th Cir. 1990).  And although *Blackstone* overruled so much of *North & South Rivers Watershed Ass'n v. Town of Scituate*, 949 F.2d 552 (1st Cir. 1991), as held that section 1319(g)(6)(A)'s preclusion extended to injunctive and declaratory relief, the ruling did not question the fact that "primary enforcement responsibility" for the CWA lies with the EPA.  *See Blackstone*, 32 F.4th at 108, quoting *Scituate*, 949 F.2d at 558.  Thus, while the role of the citizen as an adjunct to EPA's primary enforcement power is estimable, it does not supplant the discretionary authority of the EPA Administrator, particularly in areas like the enforcement of an ERP, where consistency of purpose and predictability of result are the desirable outcomes.  *See Gwaltney*, 484 U.S. at 61 ("If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.").

This interpretation comports with the discretionary language Congress chose in defining the responsibilities of the EPA Administrator in implementing section 1319(f).  See *supra* note 4.  The Administrator "*may*" notify a POTW of the wrongful discharge of pollutants into its treatment works and "*may* commence a civil action for *appropriate* relief" if the POTW

does not "commence *appropriate* enforcement action" within 30 days of notification.  33 U.S.C. § 1319(f) (emphasis added).  From a plain reading of the statute, it seems apparent that Congress intended that the Administrator have the sole discretion to determine which violations were sufficiently serious to warrant notification and, if necessary, to seek judicially-ordered remediation.

To allow citizen suits to second guess the Administrator's discretionary determinations of the appropriateness of an ERP enforcement action raises four public policy concerns.  First, it creates the specter of a flood of litigation challenging the failure of POTWs to undertake adequate enforcement actions.  In this case alone, CLF identifies over a hundred "separate and distinct" violations of the CWA related to the MWRA's alleged mishandling of individual enforcement actions. *See, e.g*., Compl. ¶¶ 101, 171.  Second, it is likely to result in a mishmash of inconsistent actions and remedies, leaving POTWs to operate mostly in the dark in implementing their own ERPs.  Third, as a practical matter, citizen groups largely lack the engineering and systems expertise that needs be brought to bear in insuring that a remedial action is appropriate to the nature of the violation and that any cost imposed will not outweigh the benefit achieved.  As the civil penalty criteria set out in section 1319(d) illustrate, violations come in a variety of degrees, some

warranting a response, others not.  These are decisions best committed to the discretionary expertise of the Administrator.[6]  Fourth, and finally, is a consideration identified by the Eleventh Circuit, albeit in a somewhat difference context.  *See Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1574 (11th Cir. 1994) (declaring that a cornerstone of democratic society is holding government publicly accountable to the governed).  As a presidential nominee, confirmed by the Senate, the EPA Administrator is a politically appointed official answerable to the President, Congress, and the public for his or her actions (or inactions), as opposed to a citizen group answerable only to its own members.

## B.    Permit Obligations

Statutory authorization aside, CLF's suit fails for a second reason.  The MWRA correctly argues that it is not in violation of its NPDES permit

---

[6] CLF argues somewhat curiously that "the EPA [Administrator] has shown no interest in getting involved with this type of case" and that the policing of POTW enforcement of ERPs (and therefore section 1365) is intended to invite citizens to step in when the Administrator abdicates his or her duty to do so.  2/9/23 Hearing Tr.; *see also id.* (arguing that the EPA's "lack of involvement allows CLF to bring this case because there is no diligent prosecution" and "demonstrates why the citizen-suit provision is so vital").  While there is no evidence supporting a dereliction of duty on the part of the Administrator, if that were to happen, a citizen suit in the nature of an action for mandamus could likely be brought under section 1665(a)(2) seeking to compel the Administrator to act, as the MWRA more or less acknowledges.  *See* Def.'s Reply (Dkt # 17) at 7-8.

because neither the NPDES permit nor its attendant ERP require that it take enforcement action every time an industrial user commits a violation.  Def.'s Mem. at 1.   Rather, the first page of the MWRA's ERP showcases the following emboldened language, which the MWRA contends affords it broad enforcement discretion: "**This document is intended as guidance solely for the use of MWRA personnel.  Nothing herein is intended to create legal rights or obligations or to limit the enforcement discretion of the Authority.**"   Def.'s Mem., Ex. 1 (Dkt # 12-1) at 2 (emphasis in original).

The interpretation of an NPDES permit is "a question of law for the courts to decide."  *Am. Canoe Ass'n Inc. v. D.C. Water & Sewer Auth.*, 306 F. Supp. 2d 30, 41 (D.D.C. 2004), citing *Nat. Res. Def. Council, Inc. v. Texaco Refin. & Mktg., Inc.*, 20 F. Supp. 2d 700, 710 (D. Del. 1998).  This court recognizes that the complexity of the NPDES permitting scheme is daunting, but "a court's task in interpreting and enforcing an NPDES permit is not— NPDES permits are treated like any other contract."  *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013).  As in contract interpretation, if a permit's language, "considered in light of the structure of the permit as a whole, 'is plain and capable of legal construction, the language alone must determine the permit's meaning.'"  *Id.* at 1204-1205,

quoting *Piney Run Pres. Ass'n v. Cnty. Com'rs of Carroll Cnty.*, 268 F.3d 255, 270 (4th Cir. 2001).

CLF cites language in the NPDES permit that it argues mandates the MWRA to take enforcement action in the wake of each and every violation. Pl.'s Opp'n at 9-10.  The court will address each of the cited provision of the NPDES permit in turn:

**Section 11(b)(iii)** of the permit states that "[e]nforcement actions shall be taken for sources which are found to be in violation of MWRA Sewer Use Regulations."  Compl., Ex 3 (Dkt # 1-3) at 15.  However, when read in the full context of the subsection, it is apparent that the irremissible language applies only to violations attributable to oil and gas separators. *See id.* (the preceding two – and only other – sentences in the subsection are specifically limited to oil and gas separators).[7]

**Sections 11(b)(ix) and 15** require that the MWRA implement a comprehensive pollution prevention plan and an industrial pretreatment program.  Compl., Ex 3 at 16 ("The permittee shall . . . implement source

---

[7] The focus on oil and gas separators reflects the heightened public concern over the controversial extraction of oil and gas using a "fracking" technique. *See* 40 C.F.R. § 435.33(a)(1) ("There shall be no discharge of wastewater pollutants associated with production, field exploration, drilling, well completion, or well treatment for unconventional oil and gas extraction (including, but not limited to, drilling muds, drill cuttings, produced sand, produced water) into publicly owned treatment works.").

reduction and pollution plans, in addition to pretreatment systems."); *id.* at 22 ("MWRA shall implement an industrial pretreatment program plan and 40 CFR Part 403."). Section 15 clarifies that the MWRA's pretreatment program is to be operated "in accordance with MWRA's approved pretreatment program and 403 CFR Part 403," which includes "[o]btain[ing] appropriate remedies for noncompliance by any industrial user with any pretreatment standard and/or requirement." *Id.* at 22. These requirements are consistent with the terms of the MWRA's ERP. As discussed below, the ERP contains discretionary language that indicates that strict adherence to the letter of the ERP is not what is required. Rather, the section 15 stipulation that the MWRA obtain "appropriate" remedies when confronted with instances of noncompliance similarly supports a reading that the MWRA is permitted to be selective in its choice of a remedy tailored to the scale and substance of the violation.

Similarly, **Section 14(b)** requires that the MWRA "develop and enforce specific effluent limits (local limits) for Industrial User(s)." *Id.* As in the case above, this requirement does not mandate that every violation be met with an enforcement action. Nor does CLF allege that the MWRA does not bring enforcement actions against industrial actors for violations – rather the allegation is that the MWRA does not act against *every* violation

16

with sufficient severity.  *See* Compl. ¶¶ 99-107 (listing MWRA's enforcement responses and penalty collections).

Traditional principles of contract interpretation, by extension, also apply to the MWRA's ERP, which is incorporated into the NPDES permit conditions.  *See* 40 C.F.R. § 403.8(c) ("The POTW's NPDES Permit will be reissued or modified by the NPDES State or EPA to incorporate the approved Program as enforceable conditions of the Permit. The modification of a POTW's NPDES Permit for the purposes of incorporating a POTW Pretreatment Program approved in accordance with the procedure in § 403.11 shall be deemed a minor Permit modification subject to the procedures in 40 CFR 122.63."); *see also* Compl. ¶¶ 68-69.  The ERP unambiguously states in its preface that it is "intended as guidance" and is not intended to "create legal rights or obligations or to limit the enforcement discretion," Def.'s Mem., Ex. 1 at 2.  The plain language of this overarching statement indicates that the ERP is meant an advisory guideline to which the MWRA must refer when addressing violations but that it is not legally binding.  *See Guidance*, *Random House Unabridged Dictionary* (2d ed. 1993) (defining "guidance" as "advice or counseling").  It follows that subsequent text — including what CLF argues amounts to mandatory enforcement language – imposes no legal obligation.  The Massachusetts

Appeals Court came to the same conclusion, determining that the MWRA did not violate federal law or its ERP by issuing a penalty assessment notice past the prescribed timeline identified in its ERP because the "ERP was merely advisory." *Chutehall Constr. Co. v. Commonwealth*, 73 Mass. App. Ct. 1104, 1104 (2008).

CLF argues that, if the MWRA is permitted to exercise "full discretion to decide whether to enforce pretreatment standards, polluters could discharge toxic substances without consequence, undermining the purpose of the Clean Water Act." Pl.'s Sur-Reply (Dkt # 20) at 1 n.2. In the first instance, where, as here, the permit terms are clear, the intent of the parties must be "ascertained from the [permit] itself."[8] *Los Angeles*, 725 F.3d at

---

[8] Even if the court were to venture beyond the terms of the NPDES permit and ERP, courts have almost uniformly found the treatment of analogous disclaimer language in an ERISA plan or in an employment handbook enforceable when set out as clearly as it is in the ERP. *See, e.g.*, *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 427 (1st Cir. 2016) ("[A] grant of discretionary decisionmaking authority in an ERISA plan must be couched in terms that *unambiguously* indicate that the claims administrator has discretion to construe the terms of the plan and determine whether benefits are due in particular instances.") (emphasis in original); *Ferguson v. Host Int'l, Inc.*, 53 Mass. App. Ct. 96, 103 (2001) (noting that if an employer "does not want the manual to be capable of being construed by the court as a binding contract . . . [a]ll that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual . . . .").

1205, quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).  In any event, the EPA itself has never drawn so dire a conclusion from the disclaimer language.  The EPA has had numerous opportunities to review, edit, and oppose the MWRA's current ERP, most recently as of August 17, 2017, and has never lodged an objection to the disclaimer language.[9]  *See* Def.'s Mem., Ex. 1 at 1.[10]

CLF argues that, at a minimum, the ERP is ambiguous about whether the MWRA has a nondiscretionary duty to enforce every instance of noncompliance.  Pl.'s Sur-Reply at 9.  Contract language is ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning

---

[9] The parties seemingly do not contest that the 2017 version of the ERP controls, having both provided it as exhibits.  *See* Compl., Ex. 5 (Dkt # 1-5); Def.s' Mem., Ex. 1.

[10] CLF also argues that EPA guidance materials and administrative enforcement action show that the EPA's position is that enforcement as prescribed in an ERP is nondiscretionary.  *See* Pl.'s Opp'n at 10-11, 14-15. Even if the court could look at extrinsic sources when the text of the document is clear, the EPA guidance materials predate the EPA's implicit approval of the MWRA's ERP.  *Id.* at 10-11 (referencing EPA guidance materials from 1989 to 2005).  Similarly, while CLF cites several EPA enforcement actions involving a party violating their ERP by failing to bring an enforcement action, these examples are inapposite.  Here, the MWRA has not violated its ERP because its ERP explicitly does not create legal rights and reserves enforcement discretion to the MWRA.  None of the cases provided by CLF mention whether the ERPs at issue contained similar language.

of the words employed and the obligations undertaken." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989).   However, "an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other's." *Jefferson Ins. Co. of N.Y. v. Holyoke*, 23 Mass. App. Ct. 472, 475 (1987).   The preliminary question of the existence of an ambiguity is matter of law for the court to determine. *Basis Tech. Corp. v. Amazon.com, Inc.*, 71 Mass. App. Ct. 29, 36 (2008).

CLF points to the following sentence as a term inconsistent with the disclaimer sentence the MWRA relies on: "Each instance of noncompliance will be met with an enforcement response."   Pl.'s Sur-Reply at 9.   However, when "interpreting contractual language, [the court must] consider the contract as a whole.   Its meaning cannot be delineated by isolating words and interpreting them as though they stood alone." *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 704 (1st Cir. 2022), quoting *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 81 (1st Cir. 2018).   There is no ambiguity here because the disclaimer applies to the entire ERP, considering the positioning and unqualified context of the disclaimer sentence.

Finally, CLF argues that MWRA's nondiscretionary duty to meet every violation with an enforcement action is also found in 40 C.F.R. § 403.8(f)(5), which states that "[t]he POTW shall develop and implement an enforcement

response plan." This sentence cannot be plausibly read to require a POTW to impose a sanction in every instance of a violation.  It merely directs the POTW to refer to its ERP in deciding upon the nature and breadth of an appropriate response.

## ORDER

For the foregoing reasons, the MWRA's Motion to Dismiss is ALLOWED.  The Clerk will enter judgment for the MWRA and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE